1   EDMUND G. BROWN JR.
    Attorney General of the State of California
2   DANE R. GILLETTE
    Chief Assistant Attorney General
3   GERALD A. ENGLER
    Senior Assistant Attorney General
4   GREGORY A. OTT
    Deputy Attorney General
5   MICHELE J. SWANSON, State Bar No. 191193
    Deputy Attorney General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA 94102-7004
7    Telephone: (415) 703-5703
     Fax: (415) 703-1234
8    Email: Michele.Swanson@doj.ca.gov

9   Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13

    MONTE L. HANEY,                          C 07-4682 CRB (PR)
14
                            Petitioner,
15
            v.
16
    DERRAL G. ADAMS, Warden,
17
                            Respondent.
18

19

    **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER TO**
20          **PETITION FOR WRIT OF HABEAS CORPUS**

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2                                                                                    **Page**

3   STATEMENT OF THE CASE                                                             1

4   STATEMENT OF FACTS                                                                2

5   STANDARD OF REVIEW FOR FEDERAL HABEAS PETITIONS
    BROUGHT BY STATE PRISONERS                                                        5

6   ARGUMENT                                                                          5

7   I.   THE TRIAL COURT'S REFUSAL TO INSTRUCT THE JURY
8        ON AGGRAVATED ASSAULT AS A LESSER INCLUDED
         OFFENSE OF TORTURE DID NOT VIOLATE PETITIONER'S
9        RIGHT TO DUE PROCESS                                                         5

10       A.   Trial Court Proceedings                                                 5

11       B.   California Court Of Appeal Opinion                                       6

12       C.   The Court Of Appeal Reasonably Concluded That The Trial Court
              Had No Duty To Instruct On Aggravated Assault As A Lesser
13            Included Offense Of Torture                                             6

14   II.  THE PROSECUTOR DID NOT EXERCISE HIS PEREMPTORY
15        CHALLENGES IN A RACIALLY MOTIVATED MANNER                                   8

16       A.   Jury Voir Dire Proceedings                                              8

17       B.   The California Supreme Court Reasonably Rejected Petitioner's
              Claim Of Prosecutorial Misconduct                                      8

18   III. TRIAL AND APPELLATE COUNSEL WERE NOT
19        INEFFECTIVE                                                                 11

20       A.   Standard Of Review For Claims Of Ineffective Assistance Of Counsel     12

21       B.   The State Court Reasonably Rejected Petitioner's Claim Of Ineffective
              Assistance Of Trial Counsel                                            12

22       C.   The State Court Reasonably Rejected Petitioner's Claim Of Ineffective
23            Assistance Of Appellate Counsel                                        13

24   CONCLUSION                                                                       14

25

26

27

28

1

# TABLE OF AUTHORITIES

2                                                                              **Page**

3  **Cases**

4  *Alberni v. McDaniel*
   458 F.3d 860 (9th Cir. 2006)                                                  7
5
   *Batson v. Kentucky*
6  476 U.S. 79 (1986)                                                     8, 11, 12

7  *Beck v. Alabama*
   447 U.S. 625 (1980)                                                           7
8
   *Brecht v. Abrahamson*
9  507 U.S. 619 (1993)                                                           8

10 *Cupp v. Naughten*
   414 U.S. 141 (1973)                                                          7
11
   *Edwards v. Lamarque*
12 475 F.3d 1121 (9th Cir. 2007)                                                5

13 *Estelle v. McGuire*
   502 U.S. 62 (1991)                                                        6, 7
14
   *Evitts v. Lucey*
15 469 U.S. 387 (1985)                                                         12

16 *Fry v. Pliler*
   127 S. Ct. 2321 (2007)                                                       8
17
   *Hopkins v. Reeves*
18 524 U.S. 88 (1998)                                                           7

19 *Huddleston v. United States*
   485 U.S. 681 (1988)                                                         10
20
   *James v. Borg*
21 24 F.3d 20 (9th Cir.1994)                                                    8

22 *Jones v. Barnes*
   463 U.S. 745 (1983)                                                         12
23
   *Jones v. Gomez*
24 66 F.3d 199 (9th Cir. 1995)                                                  9

25 *Lockyer v. Andrade*
   538 U.S. 63 (2003)                                                           5
26
   *Mendez v. Small*
27 298 F.3d 1154 (9th Cir. 2002)                                                6

28

**TABLE OF AUTHORITIES  (continued)**

| | Page |
|---|---|
| *Middleton v. McNeil*<br>541 U.S. 433 (2004) | 7 |
| *Miller v. Keeney*<br>882 F.2d 1428 (9th Cir. 1989) | 12 |
| *Miller-El v. Dretke*<br>545 U.S. 231 (2005) | 5 |
| *Mitleider v. Hall*<br>391 F.3d 1039 (9th Cir. 2004) | 11 |
| *People v. Martinez*<br>125 Cal. App. 4th 1035 (2005) | 6 |
| *Rice v. Collins*<br>546 U.S. 333 (2006) | 8 |
| *Rupe v. Wood*<br>93 F.3d 1434 (9th Cir.1996) | 13 |
| *Smith v. Robbins*<br>528 U.S. 259 (2000) | 12 |
| *Solis v. Garcia*<br>219 F.3d 922 (9th Cir. 2000) | 7 |
| *Stanton v. Benzler*<br>146 F.3d 726 (9th Cir. 1998) | 6 |
| *Strickland v. Washington*<br>466 U.S. 668 (1984) | 12, 13 |
| *Teague v. Lane*<br>489 U.S. 288 (1989) | 7 |
| *Tolbert v. Gomez*<br>190 F.3d 985 (9th Cir. 1999) | 11 |
| *Tolbert v. Page*<br>182 F.3d 677 (9th Cir. 1999) | 7 |
| *Turner v. Calderon*<br>281 F.3d 851 (9th Cir. 2002) | 13 |
| *Turner v. Marshall*<br>63 F.3d 807 (9th Cir. 1995) | 7 |
| *United States v. Smith*<br>223 F.3d 554 (7th Cir. 2000) | 10 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES  (continued)**

**Page**

*United States v. Thompson*
827 F.2d 1254 (9th Cir. 1987)                    10

*United States v. Vaccaro*
816 F.2d 443 (9th Cir. 1987)                     10

*Wilson v. Henry*
185 F.3d 986 (9th Cir.1999)                      13

*Windham v. Merkle*
163 F.3d 1092 (9th Cir. 1998)                     7

*Woodford v. Visciotti*
537 U.S. 19 (2002)                                5

*Yarborough v. Gentry*
540 U.S. 1 (2003)                                12

**Statutes**

United States Code, Title 28
    § 2254(d)                                     7
    § 2254(d)(1)                                  5

**Other Authorities**

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)        5

1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DANE R. GILLETTE
Chief Assistant Attorney General
3 | GERALD A. ENGLER
Senior Assistant Attorney General
4 | GREGORY A. OTT
Deputy Attorney General
5 | MICHELE J. SWANSON, State Bar No. 191193
Deputy Attorney General
6 |  455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
7 | Telephone: (415) 703-5703
Fax: (415) 703-1234
8 | Email: Michele.Swanson@doj.ca.gov
Attorneys for Respondent
9

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **MONTE L. HANEY,** | C 07-4682 CRB (PR) |
| Petitioner, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| **DERRAL G. ADAMS, Warden,** | |
| Respondent. | |

### STATEMENT OF THE CASE

In 2005, a jury found petitioner guilty of aggravated mayhem, torture, assault by means of force likely to produce great bodily injury, assault with a deadly weapon, corporal injury on a cohabitant, and criminal threats, and found associated great bodily injury and deadly weapon enhancements to be true. 2 CT 425, 436-443.[1/] The trial court sentenced petitioner to life in prison

---

1. "CT" refers to the State Court Clerk's Transcript, which is contained in Exhibits 1A to 1E filed in support of the Answer. "RT" refers to the State Court Reporter's Transcript of trial proceedings, which is contained in Exhibits 2A to 2Q filed in support of the Answer. "RT [Jury Selection]" refers to the State Court Reporter's Transcript of jury voir dire, which is contained in

1   with the possibility of parole, plus seven years. 2 CT 482-485.

2           In 2006, the California Court of Appeal modified the judgment and sentence on the great

3   bodily injury enhancements to comport with the jury's findings, but otherwise affirmed the judgment

4   of conviction. Exh. 5. In 2007, the California Supreme Court denied a petition for review. Exhs.

5   6, 7. That same year, the California Supreme Court denied a petition for writ of habeas corpus.

6   Exhs. 8, 9.

7           Petitioner filed the instant federal habeas petition on September 11, 2007. On January 11,

8   2008, this Court ordered respondent to show cause why the petition should not be dismissed.

9

10                          **STATEMENT OF FACTS**

11          The California Court of Appeal summarized the facts of the case as follows:

12  A. *People's Case*

13          Prior to the time of the incidents in question, appellant had been in and out of jail at
    least twice, and he and Margie Holmes had an on and off relationship for about nine
14  months. At some point Margie moved in with her grandmother, Eunice Holmes, to care
    for her, as she was ill. Eunice lived in the Rosa Parks seniors facility on Turk Street in
15  San Francisco. After his most recent release, appellant stayed at the Rosa Parks apartment
    as well.
16
            When Margie returned from work on June 11, 2002, her grandmother and appellant
17  were at the apartment. Margie had "a really bad feeling" something was going to happen
    because appellant "was looking very strange." Appellant "had to have marijuana" and
18  "did a lot of" methamphetamine.

19          Appellant was irritable and said he "nee[ed] some." Margie borrowed $10 from her
    grandmother and gave it to appellant. Margie believed that appellant left for awhile.
20
            Later that afternoon appellant started walking back and forth between the bedroom
21  and the hallway. He was looking at Margie, with a frightening look. Appellant motioned
    to her to "come here." Margie was afraid and told appellant "No, you might do
22  something." Appellant persisted, more forcefully. Margie approached appellant and
    walked past him, toward their bedroom. Just as she reached the room she felt something
23  heavy crash into her head; blood ran down her head. Appellant called her a "bitch" and
    hit her again on the head. Margie fell to her knees. The pain was excruciating and Margie
24  felt faint. Margie saw a cleaver-like knife in his hand; it came from her grandmother's
    kitchen. Appellant struck her, splitting open her left eyebrow. Margie pleaded for him
25  to stop, grabbing his leg, but appellant kicked her arm and went back to the kitchen.
    Margie called to her grandmother. Appellant returned with a much smaller knife and
26  proceeded to stab her again, this time on her right side, and two pokes on the thigh. He

27  ────────────────────────────────────────────────────────────

28  Exhibits 3A to 3B filed in support of the Answer.

1   told Margie "I hate you."

2   Eunice came in and started screaming for appellant to leave her granddaughter alone.
Appellant told her, "Mama, if you don't give me any money, I'm going to kill this bitch."
3   Eunice said she didn't have any money. Margie knew her grandmother kept money in her
bra and begged her to give appellant some money. Margie collapsed. Eunice fled to enlist
4   help from the security guard, Zaid El-Amin. El-Amin contacted Kenneth Babb, the
manager.

5

6   Appellant straddled Margie and told her "I'm going to kill you, bitch." He grabbed
her hair, pulled her head to the right and held her neck so she could not move. Appellant
7   put his hand in her left eye and "started to dig in it," "started pulling it out," saying, "I've
got to get it. I've just got to get it." Margie could feel her eye "just jingling back and
8   forth" from her cheek. Appellant repeated that he was going to kill her. Margie felt a
tremendous amount of pressure as appellant was pulling out her eye, then heard something
9   "snap" and knew her eye was gone. She blacked out.

10   When she came to, appellant was still in the room. Margie tried to remain still so
appellant would think she was dead. Eventually she no longer heard footsteps. Crawling
11   out of the bedroom, Margie saw her eye, "still wriggling." She grabbed it, then called her
mother and 911. Margie was taken by ambulance to San Francisco General Hospital.

12   Meanwhile, Babb was rushing with Eunice to her apartment on the fourth floor. He
asked El-Amin to call the police. Babb passed appellant by the elevator; he was walking
13   very calmly. As El-Amin reached for the phone, appellant touched the receiver and said,
"[Y]ou don't have to call the police dog, I'm gone, I'm leaving." He looked "a little
14   amped" from a domestic dispute, but not hysterical like Eunice. El-Amin did not think
the situation was "too bad" and thus did not follow appellant as he walked out of the
15   building.

16   The emergency room physician was not able to reattach Margie's eye because the
optic nerve had been severed. He testified that it would take "considerable force" to
17   remove an eye. Margie also suffered two stab wounds to the right flank, two to the right
thigh, an eyelid laceration and a forehead laceration.

18
Margie's mother rushed to the hospital. There, she received a call from appellant.
19   After asking how Margie was doing, he said, "I'm going to kill that bitch."

20   The police arrested appellant the next day. He told the police that he and Margie had
been smoking crack and drinking beer. They got into an argument and he left when
21   Eunice asked him to leave. He denied that anything happened and claimed to have
blacked out. Appellant said he had been high on speed and crack for seven or eight days.
22   He claimed there was something wrong with Margie and said she smoked a lot of crack.

23   B. *Defense*

24   Appellant presented a mental disease defense based on the testimony of three experts.

25   Psychiatrist Amen conducted two SPECT[2] brain scans on appellant in August 2004.
These scans look at brain blood flow and activity. Dr. Amen concluded that appellant had
26   overall decreased activity in the brain, and the condition worsened when appellant

27   _____

28   2. SPECT stands for single photon emission computed tomography.

concentrated. Dr. Amen believed appellant had trauma to his brain in the past, and probably toxic exposure that starved the neurons of oxygen. Toxic exposure could result from drug abuse, working in toxic environment, infection, near drowning, etc. Dr. Amen characterized appellant's brain as "clearly dysfunctional and damaged." Significant decreased activity as found in appellant's scans normally is associated with problems with judgment, impulse control, organization, planning and empathy. Appellant's brain would have looked "significantly worse" had the scan been conducted at the time of the incidents, due to lack of sleep and heavy drug use.

Neuropsychologist Young performed a series of psychological and neuropsychological evaluations of appellant. Appellant cooperated fully and there were no indications that he was malingering or faking his responses. Dr. Young concluded that appellant's intellectual functioning was in the borderline range. He suffered significant impairment of the temporal and frontal lobes, and the impairment affected all the brain areas. The functions associated with attention and concentration, memory and learning, and executive functioning were found to be "the most impaired." Studies have shown that impaired frontal lobe functioning is a predictor for violence.

Dr. Smith, a specialist in addiction medicine, also evaluated appellant. According to Dr. Smith, the earlier onset of addiction, the more brain impairment occurs. Appellant reported to Dr. Smith that his father started giving him alcohol and marijuana at the age of seven. He began smoking crack cocaine at 15 and shortly thereafter started using methamphetamine, his drug of choice.

Appellant also related that upon his release from prison on June 2, 2002, he began smoking high doses of methamphetamine, with minimal sleep. Over the course of this speed run, appellant's brain became more progressively impaired and he experienced some characteristics of amphetamine psychosis, including paranoia and "ideas of reference." However, Dr. Smith opined that appellant's violent outburst resulted from a high-dose, methamphetamine-induced rage overreaction to an actual sensory event; it was not a total delusion.

C. *Rebuttal*

Clinical neuropsychologist Lynch found fault with some of Dr. Young's testing and the results. He also stated from his review of Dr. Young's evaluation that he would not have ruled out the possibility that appellant had an antisocial personality disorder.

Neurologist Cassini testified that he did not believe SPECT scans were very useful in evaluating cognitive impairment or brain trauma. Further, he questioned whether Dr. Young had the best information about his background at the time of the evaluation, and believed that appellant's poor education, and the absence of challenges, training, and work experiences throughout his life could account for the test results. "You don't have to give him brain damage or . . . some kind of disease process to explain" "why he's functioning the way he is." Additionally, Dr. Cassini also noted that there was no mention of brain damage in appellant's medical or prison records. Further, he challenged Dr. Young's conclusions, from the tests administered, that appellant had frontal lobe damage and was more prone to blacking out.

D. *Surrebuttal*

Dr. Young defended all the tests she used, testifying that they were valid, reliable and accepted within the neuropsychological community.

---

1  Exh. 5 at 2-6.

2  **STANDARD OF REVIEW FOR FEDERAL HABEAS PETITIONS BROUGHT BY STATE PRISONERS**

3

4      This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996

5  (AEDPA), which imposes a "highly deferential" standard for evaluating state court rulings and

6  "demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537

7  U.S. 19, 24 (2002) (per curiam).  Under AEDPA, the federal court has no authority to grant habeas

8  relief unless the state court's ruling was "contrary to, or involved an unreasonable application of,"

9  clearly established Supreme Court precedent.  28 U.S.C. § 2254(d)(1).  A decision constitutes an

10  unreasonable application of Supreme Court law only if the state court's application of law to the facts

11  is not merely erroneous, but "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75

12  (2003).  Thus, "[o]nly if the evidence is 'too powerful to conclude anything but' the contrary" should

13  the court grant relief. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc) (quoting

14  *Miller-El v. Dretke*, 545 U.S. 231, 265 (2005)).  The petitioner bears the burden of showing that the

15  state court's decision was unreasonable. *Visciotti*, 537 U.S. at 25.

16

17                                  **ARGUMENT**

18                                       I.

19  **THE TRIAL COURT'S REFUSAL TO INSTRUCT THE JURY ON**

20  **AGGRAVATED ASSAULT AS A LESSER INCLUDED OFFENSE OF TORTURE DID NOT VIOLATE PETITIONER'S RIGHT TO DUE**

21  **PROCESS**

22      Petitioner contends that the trial court's refusal to instruct the jury on aggravated assault

23  as a lesser included offense of torture violated his right to due process.  Petition at 6.  However,

24  because aggravated assault is not a lesser included offense of torture under California law, the trial

25  court had no duty to so instruct the jury.

26  **A.  Trial Court Proceedings**

27      During a discussion of jury instructions, defense counsel asked the court to instruct the jury

28

1   on assault with force likely to produce great bodily injury as a lesser included offense of torture. 14

2   RT 982. Defense counsel cited no authority for such instruction. 14 RT 982. The court denied the

3   requested instruction, noting, "[T]he elements for torture don't appear to have included within them

4   the elements for a 245(a) assault, so first blush and a first reading it doesn't appear to me that that

5   would be a lesser to torture." 14 RT 982.

6           The next day, the court revisited the issue after defense counsel cited *People v. Martinez*,

7   125 Cal. App. 4th 1035 (2005) in support of the requested instruction. 15 RT 1005-1006. The court

8   found that *Martinez* did not mandate the instruction. 15 RT 1008-1009.

9       **B.    California Court Of Appeal Opinion**

10          The California Court of Appeal concluded that, under state law, aggravated assault is not

11  a lesser included offense of torture because "the statutory elements of torture do not include all the

12  elements of an aggravated assault." Exh. 5 at 8.   The appellate court concluded that the trial court

13  was therefore not required to give the requested instruction. Exh. 5 at 6.

14      **C.    The Court Of Appeal Reasonably Concluded That The Trial Court Had No
            Duty To Instruct On Aggravated Assault As A Lesser Included Offense Of**

15          **Torture**

16          The state court's conclusion that aggravated assault is not a lesser included offense of

17  torture as those offenses are defined in California constitutes a determination of a state law question

18  that cannot be revisited by this Court. *See Stanton v. Benzler*, 146 F.3d 726, 728 (9th Cir. 1998) (the

19  state is free to define the elements of a particular offense, and a state court's determination of what

20  constitutes an element of that offense is not open to challenge on habeas review); *see generally*

21  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to

22  reexamine state-court determinations on state-law questions."); *Mendez v. Small*, 298 F.3d 1154,

23  1158 (9th Cir. 2002) ("A state court has the last word on the interpretation of state law").  Because

24  petitioner's entire argument is based on his interpretation of state law, his claim is not cognizable

25  on federal habeas.

26          Even if the state court had not rejected the contention that aggravated assault is a lesser

27  included offense of torture, this Court could still not reach the merits of petitioner's claim. "'Under

28

1   the law of this circuit, the failure of a state trial court to instruct on lesser included offenses in a non-

2   capital case does not present a federal constitutional question.'" *Solis v. Garcia,* 219 F.3d 922, 929

3   n.7 (9th Cir. 2000) (quoting *Windham v. Merkle,* 163 F.3d 1092, 1106 (9th Cir. 1998)). In addition,

4   there is no clearly established Supreme Court authority requiring such instructions; the Supreme

5   Court has held only that a defendant may be entitled to lesser included instructions in a capital case,

6   and has expressly declined to decide whether that holding extends to non-capital cases. *Beck v.*

7   *Alabama,* 447 U.S. 625, 638 n.14 (1980). The Supreme Court's reservation of an issue demonstrates

8   that the law is not "clearly established" for purposes of 28 U.S.C. § 2254(d). *Alberni v. McDaniel,*

9   458 F.3d 860, 863-867 (9th Cir. 2006). Further, because the circuit courts are split as to whether

10  *Beck* applies to non-capital cases, habeas relief is precluded under the doctrine of *Teague v. Lane,*

11  489 U.S. 288 (1989). *Turner v. Marshall,* 63 F.3d 807, 819 (9th Cir. 1995), overruled on other

12  grounds in *Tolbert v. Page,* 182 F.3d 677 (9th Cir. 1999). And the Constitution clearly does not

13  require instructions on lesser *nonincluded* offenses. *See Hopkins v. Reeves,* 524 U.S. 88, 96-97

14  (1998).

15          Finally, even assuming petitioner could overcome the two hurdles discussed above, he

16  cannot meet his burden under 28 U.S.C. § 2254(d) to show that the state court's decision was

17  objectively unreasonable. *See Middleton v. McNeil,* 541 U.S. 433, 438 (2004) (per curiam). A claim

18  of state instructional error can be the basis of federal habeas relief only if the error, considered in

19  light of all the instructions given in addition to the trial record, "'so infected the entire trial that the

20  resulting conviction violates due process.'" *Estelle v. McGuire,* 502 U.S. at 72 (quoting *Cupp v.*

21  *Naughten,* 414 U.S. 141, 147 (1973)). The test for constitutional error is whether there is a

22  "reasonable likelihood" the jury misapplied the instructions. *Id.* The jury in this case convicted

23  petitioner of both aggravated assault and torture. The jury therefore necessarily found the elements

24  of both offenses to be satisfied beyond a reasonable doubt. Moreover, because the jury was

25  instructed on both offenses, it was not forced into an all or nothing choice in this case. Accordingly,

26  there is no reasonable likelihood the omission of the lesser included offense instruction affected the

27  jury's verdict. Further, because the jury found petitioner guilty of both aggravated assault and

28

1 | torture, any error was harmless under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). *Fry v.*

2 | *Pliler*, 127 S. Ct. 2321, 2328 (2007).

3 | **II.**

4 | **THE PROSECUTOR DID NOT EXERCISE HIS PEREMPTORY**
**CHALLENGES IN A RACIALLY MOTIVATED MANNER**

5 |

6 | Petitioner contends that the prosecutor used his peremptory challenges to exclude all

7 | African Americans from the jury. Petition at 6. Petitioner, however, has failed to state a viable

8 | claim. In any event, the record does not support petitioner's contention.

9 | **A.    Jury Voir Dire Proceedings**

10 | The prosecutor exercised nine peremptory challenges during voir dire. 2 RT [Jury

11 | Selection] 203-204, 214-215, 255-257, 272. Defense counsel did not object to any of the

12 | prosecutor's challenges.

13 | **B.    The California Supreme Court Reasonably Rejected Petitioner's Claim Of**
**Prosecutorial Misconduct**

14 |

15 | The United States Constitution prohibits the use of a peremptory challenge of a juror based

16 | solely on race. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). A *Batson* claim requires a three-step

17 | inquiry. *Rice v. Collins*, 546 U.S. 333, 338 (2006). First, the defendant must make a prima facie

18 | showing that a challenge was based on race. *Id.* Second, the prosecutor must give a race-neutral

19 | reason for the challenge. *Id.* Third, the trial court must determine whether the defendant has carried

20 | his burden of proving purposeful discrimination. *Id.*

21 | As a threshold matter, we note that it is well-settled that "[c]onclusory allegations which

22 | are not supported by a statement of specific facts do not warrant habeas relief." *James v. Borg*, 24

23 | F.3d 20, 26 (9th Cir.1994). Here, petitioner contends that the prosecutor used his peremptory

24 | challenges to exclude "all African Americans" from the jury, Petition at 6, but does not identify

25 | which jurors he claims the prosecutor challenged on racial grounds or make any reference to the

26 | record. The claim is difficult to address on the record alone because defense counsel did not object

27 | to the prosecutor's exercise of his peremptory challenges, the trial court did not conduct the three-

28 |

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus          Haney v. Adams, Warden
                                                                                        C 07-4682 CRB (PR)

1  step inquiry set forth above, and it is impossible to discern the race of the jurors challenged by the

2  prosecutor from the jury voir dire transcripts or the challenged juror questionnaires.  The claim

3  should accordingly be dismissed for lack of specificity. *Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir.

4  1995).

5          Even if this Court declines to dismiss the claim for lack of specificity, we submit that

6  sufficient race-neutral reasons support all of the prosecutor's peremptory challenges, and that a prima

7  facie case of discrimination cannot be established by petitioner.

8          Race-neutral reasons for the prosecutor's peremptory challenges are apparent for all of the

9  jurors challenged by the prosecutor.  For instance, many jurors had backgrounds in, or familiarity

10  with, illegal drug use, mental illness, or the mental health or medical fields, which raised the concern

11  that they might be more accepting of a mental defense based on heavy drug use. J.B.(1) had a friend

12  in college who was a heroin addict and died from an overdose; thought it was "hard to say" how the

13  experience might affect his ability to be fair; and believed "you can't really judge" people who are

14  addicted to drugs because the drugs make them lose control.[3]  *See* Exh. 4A at 5-6 [question 20(a)

15  & (e)]. J.K. was a graduate student at UCSF who researched psychological disorders; had a mother

16  with a drug problem; had a stepfather with a mental disorder; had himself been to a psychologist;

17  believed psychologists and psychiatrists were helpful; and might tend to believe the testimony of

18  such experts. *See* Exh. 4B at 2, 5-7 [questions 1, 20, 23- 27]. R.G. had been arrested in the past for

19  public intoxication; had friends who were addicted to crystal meth; thought people on crystal meth

20  could not think clearly; believed people on drugs needed help; had sympathy for drug users that

21  might affect his ability to be fair; had a sister with a mental illness who had seen several psychiatrists

22  in the past; thought it was "very important" to hear from experts on a mental defense; and believed

23  leniency should be given to an accused "if a mental state of insanity is obvious." Exh. 4D at 3-5

24  [questions 9-10, 14, 16, 20-22, 24-27, 30]. W.N. had degrees in physics and biomedical engineering;

25

26

27      3.  We refer to the challenged jurors by their first and last initials in order to preserve their
privacy. Because two of the challenged jurors have the same initials, we will refer to them as J.B.(1)

28  and J.B.(2).

1    was an assistant research physicist at UCSF; worked on developing surgical devices; had a former

2    roommate who was a drug user and did not know how that experience might affect his ability to be

3    fair; was friends with a neurologist, psychologist, and psychiatrist; and was "very familiar" with

4    brain imaging, or spectrometry. 1 RT [Jury Selection] 87-88, 116-117; Exh. 4F at 2, 5 [questions

5    1, 5, 20]. J.D. and J.B.(2) were social workers who had provided psychiatric counseling in the past

6    and were familiar with substance abuse issues. 2 RT [Jury Selection] 144-145, 248; Exh. 4G at 2,

7    6 [questions 2, 23]; Exh. 4H at 6 [question 23]; see United States v. Thompson, 827 F.2d 1254, 1260

8    (9th Cir. 1987) (a juror's occupation constitutes a race-neutral reason for a peremptory challenge).

9    In addition, J.D. had consulted with a psychologist or psychiatrist in the past for depression; thought

10   that the testimony of such professionals could be valuable in evaluating a mental defense; thought

11   she might be more attuned to such testimony as a mental health professional herself; and knew one

12   of the mental health experts who would be testifying on behalf of the defense. 2 RT [Jury Selection]

13   145; Exh. 4G at 7, 10 [questions 24-27, 39]. J.B.(2) had been arrested in the past for possession of

14   marijuana; had seen a psychiatrist for an addiction to speed; thought he might be biased because of

15   his past drug use; and believed he "would probably side with psychologists or psychiatrists about a

16   mental illness or impairment suffered by the accused." 2 RT [Jury Selection] 248; Exh. 4H at 4-7

17   [questions 14, 20-22, 25, 27]. And finally, S.M. had been treated by a psychiatrist in the past for

18   mental illness. Exh. 4I at 7 [questions 24-25].

19          Many of the challenged jurors also gave indications that they might be biased against the

20   prosecution. J.K., M.C., and S.M. had family members who had been arrested or prosecuted for

21   committing crimes. 1 RT [Jury Selection] 63, 85; 2 RT [Jury Selection] 254-255; see also Exh. 4E

22   at 4 [question 14]; Exh. 4B at 4 [questions 14-15]; Exh. 4I at 4 [question 14]; United States v.

23   Vaccaro, 816 F.2d 443, 457 (9th Cir. 1987), overruled on other grounds by Huddleston v. United

24   States, 485 U.S. 681 (1988) (challenging a juror based on family member's contact with the criminal

25   justice system proper); see also United States v. Smith, 223 F.3d 554, 569 (7th Cir. 2000) (prosecutor

26   in drug trial gave nondiscriminatory reason for striking juror whose brother had been prosecuted for

27   drugs). I.S., R.G., and W.N. were all victims of crime, with I.S. and R.G. reporting having negative

28

1   experiences with the police, and W.N. indicating that the police never arrested anyone in his case

2   and that he did not know if the incident would cause him to be biased. 1 RT [Jury Selection] 66, 69,

3   74-75; Exh. 4C at 3-4 [questions 10, 15]; Exh 4D at 4 [question 15]; Exh. 4F at 4 [question 15].

4   Additionally, R.G. thought he might distrust a police officer's testimony because he felt that police

5   officers were biased, and W.N. felt that the crime rate in San Francisco was "very high" and might

6   cause him to be biased. Exh. 4D at 3 [question 9]; Exh. 4F at 5 [question 18]; *see Mitleider v. Hall*,

7   391 F.3d 1039, 1048 (9th Cir. 2004) (prosecutor's concerns of bias toward law enforcement valid

8   basis for challenge). Further, R.G. thought the judicial system was unfair and biased, while J.B.(2)

9   felt that some conduct should not be classified as criminal and that his feelings might cause him to

10  be biased. 1 RT [Jury Selection] 69-70; Exh. 4D at 9 [question 36]; Exh. 4H at 5 [question 18]; *see*

11  *Tolbert v. Gomez*, 190 F.3d 985, 989 (9th Cir. 1999) (challenging a juror based on his expressed

12  opinion of the judicial system does not violate *Batson*). Moreover, R.G. was a supporter of several

13  prisoners' rights organizations. Exh. 4D at 5 [question 17].

14          Finally, a couple of the challenged jurors had race-neutral issues that made them less than

15  ideal candidates for sitting on a jury. M.C. had trouble understanding some of the questions on the

16  juror questionnaire but could not articulate what she did not understand, raising the concern that she

17  might have trouble understanding the trial proceedings and communicating her views during

18  deliberations. 1 RT [Jury Selection] 109-110. And I.S. got migraines if she sat for too long, raising

19  the concern that she might be unable to focus on the trial if she developed a migraine during the

20  proceedings. 1 RT [Jury Selection] 114-115; Exh. 4C at 9 [question 36].

21          In sum, the record reveals legitimate race-neutral reasons for challenging all of these

22  jurors, and petitioner cannot make out a prima facie case of discrimination. Accordingly, petitioner

23  has failed to satisfy his burden of proving his *Batson* claim.

24

25                                              **III.**

26          **TRIAL AND APPELLATE COUNSEL WERE NOT INEFFECTIVE**

27          Petitioner contends that trial counsel was ineffective for failing to object to the

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus        Haney v. Adams, Warden
                                                                                     C 07-4682 CRB (PR)
                                            11

1  prosecutor's use of peremptory challenges to exclude all African Americans from the jury. Petition

2  at 6. He further contends that appellate counsel was ineffective for failing to argue that petitioner

3  was improperly convicted of five offenses for one course of conduct. Petition at 6. There is no merit

4  to either of these claims.

5      **A.    Standard Of Review For Claims Of Ineffective Assistance Of Counsel**

6          In order to prevail on a claim of ineffective assistance of counsel, a defendant must

7  establish that: (1) counsel's performance fell below an objective standard of reasonableness; and (2)

8  there is a reasonable probability that, but for counsel's errors, he would have received a more

9  favorable result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The *Strickland* standard

10  applies to claims of ineffective assistance of appellate counsel as well as trial counsel. *Evitts v.*

11  *Lucey*, 469 U.S. 387, 396 (1985). On federal habeas, a petitioner must show that the state court

12  applied *Strickland* to the facts of his case in an objectively unreasonable manner. *Yarborough v.*

13  *Gentry*, 540 U.S. 1, 5 (2003) (per curiam).

14          "There can hardly be any question about the importance of having the appellate advocate

15  examine the record with a view to selecting the most promising issues for review. This has assumed

16  a greater importance in an era when oral argument is strictly limited in most courts— often to as little

17  as 15 minutes—and when page limits on briefs are widely imposed." *Jones v. Barnes*, 463 U.S. 745,

18  752-753 (1983). "Experienced advocates since time beyond memory have emphasized the

19  importance of winnowing out weaker arguments on appeal and focusing on one central issue if

20  possible, or at most on a few key issues." *Id.* at 751-752; *accord, Miller v. Keeney*, 882 F.2d 1428,

21  1434 (9th Cir. 1989) ("the weeding out of weaker issues is widely recognized as one of the hallmarks

22  of effective appellate advocacy"). Thus, "it is still possible to bring a *Strickland* claim based on

23  [appellate] counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel

24  was incompetent." *Smith v. Robbins*, 528 U.S. 259, 288 (2000).

25      **B.    The State Court Reasonably Rejected Petitioner's Claim Of Ineffective
            Assistance Of Trial Counsel**

26

27          Petitioner contends that defense counsel should have raised a *Batson* objection to the

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus            Haney v. Adams, Warden
                                                                                         C 07-4682 CRB (PR)

                                                    12

1  prosecutor's use of peremptory challenges to exclude all African Americans from the jury. However,

2  as noted above in Argument II, sufficient race-neutral reasons existed for all of the jurors challenged

3  by the prosecutor. As counsel cannot be faulted for not making a futile objection, petitioner's claim

4  of ineffective assistance of counsel necessarily fails. *See Wilson v. Henry*, 185 F.3d 986, 990 (9th

5  Cir.1999) (to show prejudice under *Strickland* from failure to file a motion, petitioner must show that

6  (1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as

7  meritorious, and (2) had the motion been granted, it is reasonable that there would have been an

8  outcome more favorable to him); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir.1996) (failure to take

9  futile action can never be deficient performance).

10  **C.  The State Court Reasonably Rejected Petitioner's Claim Of Ineffective Assistance Of Appellate Counsel**

11

12  Petitioner contends that appellate counsel was ineffective for failing to argue that petitioner

13  was improperly convicted of five offenses for one course of conduct. We note, however, that

14  counsel did raise this argument on appeal with respect to two of petitioner's convictions: aggravated

15  assault and torture. In rejecting the argument, the California Court of Appeal noted the following:

16  > In California, a single act or course of conduct by a defendant can result in multiple convictions. (§ 954; *People v. Pearson* (1986) 42 Cal. 3d 351, 354.) Citing the judicially

17  > created exception to this rule which prohibits multiple convictions based on necessarily included offenses (*People v. Reed* (2006) 38 Cal. 4th 1224, 1227), appellant urges that we

18  > strike his conviction for aggravated assault as necessarily included within the torture conviction. Aggravated assault is not a lesser included offense of torture and thus we will

19  > not strike the former conviction.

20  Exh. 5 at 9.

21  Given California's rule that a single course of conduct can result in multiple convictions

22  except in the case of necessarily included offenses, appellate counsel was not ineffective for not

23  making this argument with regard to all five of petitioner's convictions. *See Turner v. Calderon*, 281

24  F.3d 851, 872 (9th Cir. 2002) (the failure to raise untenable claims on appeal does not constitute

25  ineffectiveness). Moreover, given California's rule that a defendant may sustain multiple

26  convictions for one course of conduct, petitioner cannot show any prejudice arising from counsel's

27  performance.

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus         Haney v. Adams, Warden
                                                                                      C 07-4682 CRB (PR)

1

**CONCLUSION**

2      Accordingly, respondent respectfully requests that the petition for writ of habeas corpus

3   be denied.

4          Dated:  July 24, 2008

5                             Respectfully submitted,

6                             EDMUND G. BROWN JR.
                              Attorney General of the State of California

7                             DANE R. GILLETTE
                              Chief Assistant Attorney General

8
                              GERALD A. ENGLER
9                             Senior Assistant Attorney General

                              GREGORY A. OTT
10                            Deputy Attorney General

11

12
                              /s/ Michele J. Swanson
13                            MICHELE J. SWANSON
                              Deputy Attorney General

14                            Attorneys for Respondent

15     20126076.wpd
       SF2008400165
16

17

18

19

20

21

22

23

24

25

26

27

28

Memo. of Pts. and Auths. in Support of Answer to Pet. for Writ of Hab. Corpus          Haney v. Adams, Warden
                                                                                       C 07-4682 CRB (PR)