1
2
3
4
5
6
7
8
9

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

10
11
12
13
14

MONTE L. HANEY,                    )
                                   )
          Petitioner,              )        No. C 07-4682 CRB (PR)
                                   )
     vs.                           )        ORDER DENYING PETITION
                                   )        FOR A WRIT OF HABEAS
DERRAL G. ADAMS, Warden,           )        CORPUS
                                   )
          Respondent.              )
_____   )

15
16       Petitioner, a state prisoner incarcerated at California State Prison,

17  Corcoran, seeks a writ of habeas corpus under 28 U.S.C. § 2254 challenging a

18  conviction from San Francisco County Superior Court.  For the reasons set forth

19  below, the petition will be denied.

20                      **STATEMENT OF THE CASE**

21       On June 11, 2002, petitioner struck his girlfriend with a heavy object,

22  ripped out her eye, stabbed her several times and threatened her.  A jury

23  convicted him of aggravated mayhem, torture, assault with force likely to

24  produce great bodily injury, assault with a deadly weapon, willful infliction of

25  corporal injury on a co-habitant, and criminal threats.  The jury also found the

26  great bodily injury and weapons enhancements alleged in connection with certain

27  counts to be true. On March 11, 2005, the court sentenced petitioner to life in

28  prison with the possibility of parole, plus seven years.

On December 20, 2006, the California Court of Appeal modified the judgment and sentence to comport with the jury's finding on the great bodily injury enhancement and affirmed in all other respects.  On April 18, 2007, the Supreme Court of California denied review.

Petitioner also sought habeas relief from the state courts until the Supreme Court of California denied his final petition on September 12, 2007.

Petitioner then filed the instant federal petition for a writ of habeas corpus under 28 U.S.C. § 2254.  Per order filed on January 11, 2008, the court found that the petition, liberally construed, stated cognizable claims under § 2254 and ordered respondent to show cause why a writ of habeas corpus should not be granted.  Respondent has filed an answer to the order to show cause and petitioner has filed a traverse.

## STATEMENT OF THE FACTS

The California Court of Appeal summarized the facts of the case as follows:

### A. *People's Case*

Prior to the time of the incidents in question, appellant had been in and out of jail at least twice, and he and Margie Holmes had an on and off relationship for about nine months. At some point Margie moved in with her grandmother, Eunice Holmes, to care for her, as she was ill. Eunice lived in the Rosa Parks seniors facility on Turk Street in San Francisco. After his most recent release, appellant stayed at the Rosa Parks apartment as well.

When Margie returned from work on June 11, 2002, her grandmother and appellant were at the apartment. Margie had "a really bad feeling" something was going to happen because appellant "was looking very strange." Appellant "had to have marijuana" and "did a lot of" methamphetamine.

Appellant was irritable and said he "nee[ed] some." Margie borrowed $10 from her grandmother and gave it to appellant. Margie believed that appellant left for awhile.

Later that afternoon appellant started walking back and forth between the bedroom and the hallway. He was looking at Margie,

with a frightening look. Appellant motioned to her to "come here." Margie was afraid and told appellant "No, you might do something." Appellant persisted, more forcefully. Margie approached appellant and walked past him, toward their bedroom. Just as she reached the room she felt something heavy crash into her head; blood ran down her head. Appellant called her a "bitch" and hit her again on the head. Margie fell to her knees. The pain was excruciating and Margie felt faint. Margie saw a cleaver-like knife in his hand; it came from her grandmother's kitchen. Appellant struck her, splitting open her left eyebrow. Margie pleaded for him to stop, grabbing his leg, but appellant kicked her arm and went back to the kitchen. Margie called to her grandmother. Appellant returned with a much smaller knife and proceeded to stab her again, this time on her right side, and two pokes on the thigh. He told Margie "I hate you."

Eunice came in and started screaming for appellant to leave her granddaughter alone. Appellant told her, "Mama, if you don't give me any money, I'm going to kill this bitch."Eunice said she didn't have any money. Margie knew her grandmother kept money in her bra and begged her to give appellant some money. Margie collapsed. Eunice fled to enlist help from the security guard, Zaid El-Amin. El-Amin contacted Kenneth Babb, the manager.

Appellant straddled Margie and told her "I'm going to kill you, bitch."He grabbed her hair, pulled her head to the right and held her neck so she could not move. Appellant put his hand in her left eye and "started to dig in it," "started pulling it out," saying, "I've got to get it. I've just got to get it."Margie could feel her eye "just jingling back and forth" from her cheek. Appellant repeated that he was going to kill her. Margie felt a tremendous amount of pressure as appellant was pulling out her eye, then heard something "snap" and knew her eye was gone. She blacked out.

When she came to, appellant was still in the room. Margie tried to remain still so appellant would think she was dead. Eventually she no longer heard footsteps. Crawling out of the bedroom, Margie saw her eye, "still wriggling." She grabbed it, then called her mother and 911. Margie was taken by ambulance to San Francisco General Hospital.

Meanwhile, Babb was rushing with Eunice to her apartment on the fourth floor. He asked El-Amin to call the police. Babb passed appellant by the elevator; he was walking very calmly. As El-Amin reached for the phone, appellant touched the receiver and said, "[Y]ou don't have to call the police dog, I'm gone, I'm leaving."He looked "a little amped" from a domestic dispute, but not hysterical like Eunice. El-Amin did not think the situation was "too bad" and thus did not follow appellant as he walked out of the building.

The emergency room physician was not able to reattach Margie's eye because the optic nerve had been severed. He testified that it

1    would take "considerable force" to remove an eye. Margie also
     suffered two stab wounds to the right flank, two to the right thigh,
2    an eyelid laceration and a forehead laceration.

3    Margie's mother rushed to the hospital. There, she received a call
     from appellant. After asking how Margie was doing, he said, "I'm
4    going to kill that bitch."

5    The police arrested appellant the next day. He told the police that
     he and Margie had been smoking crack and drinking beer. They got
6    into an argument and he left when Eunice asked him to leave. He
     denied that anything happened and claimed to have blacked out.
7    Appellant said he had been high on speed and crack for seven or
     eight days. He claimed there was something wrong with Margie
8    and said she smoked a lot of crack.

9    B.  *Defense*

10   Appellant presented a mental disease defense based on the
     testimony of three experts.

11
     Psychiatrist Amen conducted two [single photon emission
12   computed tomography (SPECT)] brain scans on appellant in
     August 2004. These scans look at brain blood flow and activity. Dr.
13   Amen concluded that appellant had overall decreased activity in the
     brain, and the condition worsened when appellant concentrated. Dr.
14   Amen believed appellant had trauma to his brain in the past, and
     probably toxic exposure that starved the neurons of oxygen. Toxic
15   exposure could result from drug abuse, working in toxic
     environment, infection, near drowning, etc. Dr. Amen characterized
16   appellant's brain as "clearly dysfunctional and damaged."
     Significant decreased activity as found in appellant's scans
17   normally is associated with problems with judgment, impulse
     control, organization, planning and empathy. Appellant's brain
18   would have looked "significantly worse" had the scan been
     conducted at the time of the incidents, due to lack of sleep and
19   heavy drug use.

20   Neuropsychologist Young performed a series of psychological and
     neuropsychological evaluations of appellant. Appellant cooperated
21   fully and there were no indications that he was malingering or
     faking his responses. Dr. Young concluded that appellant's
22   intellectual functioning was in the borderline range. He suffered
     significant impairment of the temporal and frontal lobes, and the
23   impairment affected all the brain areas. The functions associated
     with attention and concentration, memory and learning, and
24   executive functioning were found to be "the most impaired."
     Studies have shown that impaired frontal lobe functioning is a
25   predictor for violence.

26   Dr. Smith, a specialist in addiction medicine, also evaluated
     appellant. According to Dr. Smith, the earlier onset of addiction,
27

28                                    4

the more brain impairment occurs. Appellant reported to Dr. Smith that his father started giving him alcohol and marijuana at the age of seven. He began smoking crack cocaine at 15 and shortly thereafter started using methamphetamine, his drug of choice.

Appellant also related that upon his release from prison on June 2, 2002, he began smoking high doses of methamphetamine, with minimal sleep. Over the course of this speed run, appellant's brain became more progressively impaired and he experienced some characteristics of amphetamine psychosis, including paranoia and "ideas of reference." However, Dr. Smith opined that appellant's violent outburst resulted from a high-dose, methamphetamine-induced rage overreaction to an actual sensory event; it was not a total delusion.

C.  *Rebuttal*

Clinical neuropsychologist Lynch found fault with some of Dr. Young's testing and the results. He also stated from his review of Dr. Young's evaluation that he would not have ruled out the possibility that appellant had an antisocial personality disorder.

Neurologist Cassini testified that he did not believe SPECT scans were very useful in evaluating cognitive impairment or brain trauma. Further, he questioned whether Dr. Young had the best information about his background at the time of the evaluation, and believed that appellant's poor education, and the absence of challenges, training, and work experiences throughout his life could account for the test results. "You don't have to give him brain damage or . . . some kind of disease process to explain""why he's functioning the way he is." Additionally, Dr. Cassini also noted that there was no mention of brain damage in appellant's medical or prison records. Further, he challenged Dr. Young's conclusions, from the tests administered, that appellant had frontal lobe damage and was more prone to blacking out.

D.  *Surrebuttal*

Dr. Young defended all the tests she used, testifying that they were valid, reliable and accepted within the neuropsychological community.

People v. Haney, No. A110037, 2006 WL 3735949, at **1-3 (Cal. Ct. App. Dec. 20, 2006) (footnote omitted).

/

/

/

**DISCUSSION**

A.    Standard of Review

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state

6

1    court's application of clearly established federal law was "objectively

2    unreasonable."  Id. at 409.

3           The only definitive source of clearly established federal law under 28

4    U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme

5    Court as of the time of the state court decision.  Id. at 412; Clark v. Murphy, 331

6    F.3d 1062, 1069 (9th Cir. 2003).  While circuit law may be "persuasive authority"

7    for purposes of determining whether a state court decision is an unreasonable

8    application of Supreme Court precedent, only the Supreme Court's holdings are

9    binding on the state courts and only those holdings need be "reasonably" applied.

10   Id.

11   B.     Claims & Analysis

12          Petitioner raises four claims for relief under § 2254: (1) instructional error;

13   (2) discriminatory use of peremptory challenges; (3) ineffective assistance of trial

14   and appellate counsel; and (4) prosecutorial misconduct/vindictive prosecution.

15          1.     Instructional error

16                 Petitioner claims that the trial court's refusal to instruct the jury on

17   aggravated assault as a lesser included offense of torture violated his right to due

18   process.  Pet. at 6.  The claim is without merit.

19          The record shows that defense counsel asked the trial court to instruct the

20   jury on aggravated assault (i.e., assault with force likely to produce great bodily

21   injury) as a lesser included offense of torture.  Rep. Tr. Vol. 14 at 982.  When

22   asked if he had any authority to support the instruction, counsel replied, "no."  Id.

23   The court denied the instruction, noting, "the elements for torture don't appear to

24   have included within them the elements for a 245(a) assault, so first blush and a

25   first reading it doesn't appear to me that that would be a lesser to torture."  Id.

26   The next day, counsel cited People v. Martinez, 125 Cal. App. 4th 1035 (2005),

27

28                                              7

1    in support of the requested instruction.  Rep. Tr. Vol. 15 at 1005-06.  The court

2    found that <u>Martinez</u> did not mandate the instruction.  <u>Id.</u> at 1008-09.

3          The California Court of Appeal agreed with the trial court.  It found that,

4    under state law, aggravated assault is not a lesser included offense of torture

5    because "the statutory elements of torture do not include all the elements of an

6    aggravated assault."  <u>People v. Haney</u>, 2006 WL 3735949, at *4.  The court

7    rejected petitioner's argument that the enhancements to the torture count

8    converted the aggravated assault count into a necessarily included offense and

9    concluded that the trial court was not required to instruct the jury that aggravated

10    assault is a lesser included offense of torture.  <u>Id.</u>

11          The California Court of Appeal's rejection of petitioner's instructional

12    error claim was not contrary to, or involved an unreasonable application of,

13    clearly established Supreme Court precedent.  28 U.S.C. § 2254(d).  Although the

14    Supreme Court has held that a defendant may be entitled to lesser included

15    instructions in a capital case, it has expressly declined to decide whether that

16    holding extends to non-capital cases.  <u>See</u> <u>Beck v. Alabama</u>, 447 U.S. 625, 638

17    n.14 (1980).  Because the Court has "expressly left this issue an 'open question,'"

18    the California Court of Appeal did not unreasonably apply clearly established

19    federal law in rejecting petitioner's claim that the trial court's refusal to instruct

20    the jury on aggravated assault as a lesser included offense of torture violated his

21    right to due process.  <u>Alberni v. McDaniel</u>, 458 F.3d 860, 866 (9th Cir. 2006);

22    <u>see, e.g.</u>, <u>Larson v. Palmateer</u>, 515 F.3d 1057, 1066 (9th Cir. 2008) (because

23    Supreme Court expressly reserved the question of whether using evidence of

24    prior crimes to show propensity for criminal activity could ever violate due

25    process, state court's rejection of claim did not unreasonably apply clearly

26    established federal law).  Petitioner is not entitled to federal habeas relief on his

27

28                                    8

instructional error claim because the "right [he] asserts has not been clearly

established by the Supreme Court, as required by [28 U.S.C. § 2254(d)]."

Alberni, 458 F.3d at 867.

2.    Use of peremptory challenges

Petitioner claims that the prosecutor used his peremptory

challenges to exclude all African Americans from the jury.  Pet. at 6.  The claim

is without merit.

The Equal Protection Clause forbids the exclusion of jurors by peremptory

challenge solely on account of their race.  Batson v. Kentucky, 476 U.S. 79, 89

(1986).  Batson permits prompt rulings on objections to peremptory challenges

under a three-step process.  First, the defendant must make a prima facie showing

that the prosecutor has exercised peremptory challenges on the basis of race.  Id.

at 96-97.  That is, the defendant must demonstrate that the facts and the

circumstances of the case "raise an inference" that the prosecution has excluded

venire members from the petit jury on account of their race.  Id. at 96.  If the

defendant makes this showing, the burden then shifts to the prosecutor to

articulate a race-neutral explanation for striking the jurors in question.  Id. at 97.[1]

Finally, the court must determine whether the defendant has carried his burden of

proving purposeful discrimination.  Id. at 98.  To fulfill its duty, the court must

evaluate the prosecutor's proffered reasons and determine whether there was

intentional discrimination.  Lewis v. Lewis, 321 F3d 824, 831 (9th Cir 2003).

The record shows that the prosecutor exercised nine peremptory

challenges during voir dire and that defense counsel did not object to any of

---

[1]During step two, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral.  Hernandez v. New York, 500 U.S. 352, 360 (1991).

them.  See Rep. Tr. Vol. 2 at 203-04, 214-15, 255-57, 272.  Petitioner nonetheless argues that the prosecutor exercised his peremptory challenges in a racially motivated manner because "there were only two potential African American jurors available [and] the prosecutor excluded both of them."  Traverse at 8. Petitioner adds nothing else.

Petitioner's claim cannot be meaningfully evaluated under Batson because there was no objection or three-step inquiry during jury selection.  Cf. Abu-Jamal v. Horn, 520 F.3d 272, 283-84 (3d Cir. 2008) (Batson claim barred on habeas review if there was no objection to discriminatory use of peremptory challenges during jury selection).  But even if the claim were analyzed without the benefit of the Batson procedure, it fails.  The only information petitioner provides is that two African-American jurors were peremptorily challenged.  This is not enough to satisfy his burden of showing the discriminatory intent or purpose necessary for an equal protection violation under Batson.  See Batson, 476 U.S. at 98.  The state courts' rejection of petitioner's Batson claim on collateral review cannot be said to be contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  See 28 U.S.C. § 2254(d).

This conclusion is supported by this court's independent review of the jury voir dire transcripts and challenged juror questionnaires.  Although it is impossible to discern the race of the nine jurors peremptorily challenged by the prosecutor from the jury voir dire transcripts and challenged juror questionnaires, the jury voir dire transcripts and challenged juror questionnaires show race-neutral reasons for all of the prosecutor's nine peremptory challenges.

Seven of the nine challenged jurors had backgrounds in, or familiarity with, illegal drug use, mental illness, or the mental health or medical fields, which raised the concern that they might be more accepting of a mental defense

10

based on drug use.  J.B.(1)[2] had a friend in college who was a heroin addict and died from an overdose; though it was "hard to say" how the experience might affect his ability to be fair; and believed "you can't really judge" people who are addicted to drugs because drugs make them lose control.  Resp't Ex. 4A at 5-6 (question 20(a) & (e)).  J.K. was a graduate student at UCSF who researched psychological disorders; had a mother with a drug problem; had a stepfather with a mental disorder; had himself been to a psychologist; believed psychologists and psychiatrists were helpful; and might believe the testimony of such experts.  See Resp't Ex. 4B at 2, 5-7 (questions 1, 20, 23-27).  R.G. had been arrested in the past for public intoxication; had friends who were addicted to crystal meth; thought people on crystal meth could not think clearly; had sympathy for drug users that might affect his ability to be fair; had a sister with a mental illness who had seen several psychiatrists; thought it was "very important" to hear from experts on a mental defense; and believed leniency should be given to an accused "if a mental state of insanity is obvious."  Resp't Ex. 4D at 3-5 (questions 9-10, 14, 16, 20-22, 24-27, 30).  W.N. had degrees in physics and biomedical engineering; was an assistant research physicist at UCSF; had a former roommate who was a drug user and did not know how that experience might affect his ability to be fair; was friends with a neurologist, psychologist and psychiatrist; and was "very familiar" with brain imaging or spectrometry.  Rep. Tr. Vol. 1 at 87-88; Resp't Ex. 4F at 2, 5 (questions 1, 5, 20).  J.D. and J.B.(2) were social workers who had provided psychiatric counseling and were familiar with substance abuse issues.  See Rep. Tr. Vol. 2 at 144-45, 248; Resp't Ex. 4G at 2, 6

---

[2]The challenged jurors are referred to by their first and last initials in order to preserve.  Because two of them have the same initials, they will be referred to as J.B.(1) and J.B.(2).

11

(questions 2, 23); Resp't Ex. 4H at 6 (question 23).[3]  In addition, J.D. had
consulted with a psychologist or psychiatrist in the past for depression; thought
that the testimony of such professionals could be valuable in evaluating a mental
defense; though she might ne more attuned to such testimony as a mental health
professional; and knew one of the mental health experts who would be testifying
on behalf of the defense.  See Rep. Tr. Vol. 2 at  154; Resp't Ex. 4G at 7, 10
(questions 24-27, 39).  J.B.(2) had been arrested in the past of possession of
marijuana; had seen a psychiatrist for an addiction to speed; thought he might be
biased because of his past drug use; and believed he "would probably side with
psychologists or psychiatrists about a mental illness or impairment by the
accused."  Rep. Tr. Vol. 2 at 248; Resp't Ex. 4H at 4-7 (questions 14, 20-22, 25,
27).  And S.M. had been treated by a psychiatrist for mental illness.  See Resp't
Ex. 4I at 7 (questions 24-25).

Seven of the nine challenged jurors gave indications that they might be
biased against the prosecution.  J.K., M.C. and S.M. had family members who
had been arrested or prosecuted for committing crimes.  See Rep. Tr. Vol. 1 at
63, 85; Rep. Tr. Vol. 2 at 254-55; Resp't Ex. 4E at 4 (question 14); Resp't Ex. 4B
at 4 (questions 14-15); Resp't Ex. 4I at 4 (question 4).[4]  I.S., R.G. and W.N. were
all victims of crime, with I.S. and R.G. reporting having negative experiences

[3]A juror's occupation may constitute a race-neutral reason for a
peremptory challenge.  See United States v. Thompson, 827 F.2d 1254, 1260 (9th
Cir. 1987).

[4]A juror's family member's contact with the criminal justice system may
constitute a race-neutral reason for a peremptory challenge.  See United States v.
Vaccaro, 816 F.2d 443, 457 (9th Cir. 1987), overruled on other grounds by
Huddleston v. United States, 485 U.S. 681 (1988); see also United States v.
Smith, 223 F.3d 554, 569 (7th Cir. 2000) (prosecutor in drug trial gave
nondiscriminatory reason for striking juror whose brother had been prosecuted
for drugs).

with the police, and W.N. indicating that the police never arrested anyone in his case and that he did not know if the incident would cause him to be biased.  See Rep. Tr. Vol. 1 at 66, 69, 74-75; Resp't Ex.4C at 3-4 (questions 10, 15); Resp't Ex. 4D at 4 (question 15); Resp't Ex. 4F at 4 (question 15).  In addition, R.G. thought he might distrust a police officer's testimony because he felt that police officers were biased, and W.N. felt that the crime rate in San Francisco was "very high" and might cause him to be biased.  Resp't Ex. 4D at 3(question 9); Resp't Ex. 4F at 5 (question 18).[5]  R.G. also felt the judicial system was unfair and biased, and J.B.(2) felt that some conduct should not be classified as criminal and that his feelings might cause him to be biased.  See Rep. Tr. Vol. 1 at 69-70; Resp't Ex. 4D at 9 (question 36); Resp't Ex. 4H at 5(question 18).[6]  R.G. was also a supporter of several prisoners' rights organizations.  See Resp't Ex. 4D at 5 (question 17).

Two of the nine challenged jurors had race-neutral issues that made them poor candidates for sitting on a jury.  M.C. had trouble understanding some of the questions on the juror questionnaire but could not articulate what she did not understand, raising the concern that she might have trouble understanding the trial proceedings and communicating her views during deliberations.  See Rep. Tr. Vol. 1 at 109-110.  And I.S. reported getting migraines if she sat for too long, raising the concern that she might be unable to focus on the trial if she developed a migraine during the proceedings.  See Rep. Tr. Vol. 1 at 114-15; Resp't Ex. 4C

---

[5]A prosecutor's concern of bias toward law enforcement may constitute a race-neutral reason for a peremptory challenge.  See Mitleider v. Hall, 391 F.3d 1039, 1048 (9th Cir. 2004).

[6]A juror's expressed negative opinion of the judicial system may constitute a race-neutral reason for a peremptory challenge.  See Tolbert v. Gomez, 190 F.3d 985, 989 (9th Cir. 1999).

1    at 9 (question 36).

2         Petitioner has set forth no evidence whatsoever to rebut the above-noted

3    legitimate race-neutral reasons and prove purposeful discrimination.  He is not

4    entitled to federal habeas relief on his conclusory <u>Batson</u> claim.

5              3.    <u>Ineffective assistance of counsel</u>

6              Petitioner claims that trial counsel was ineffective for failing to

7    object to the prosecutor's use of peremptory challenges to exclude all African

8    Americans from the jury, and that appellate counsel was ineffective for failing to

9    argue on appeal that petitioner was improperly convicted of five offenses for one

10   course of conduct.  Pet. at 6.  The claims are without merit.

11        To prevail on a claim of ineffective assistance of counsel, petitioner must

12   pass the two-part test set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 687

13   (1984).  Petitioner must demonstrate that: (1) "counsel's representation fell below

14   an objective standard of reasonableness," and (2) "counsel's deficient

15   performance prejudiced the defense."  <u>Id.</u> at 687-88.  Concerning the first

16   element, there is a "strong presumption that counsel's conduct falls within the

17   wide range of reasonable professional assistance." <u>Id.</u> at 689.  Hence, "judicial

18   scrutiny of counsel's performance must be highly deferential." <u>Id.</u>  To fulfill the

19   second element, a "defendant must show that there is a reasonable probability

20   that, but for counsel's unprofessional errors, the result of the proceeding would

21   have been different." <u>Id.</u> at 694.  A reasonable probability is a probability

22   sufficient to undermine the confidence in the outcome.  <u>Id.</u>

23        Claims of ineffective assistance of appellate counsel are reviewed

24   according to the standard set out in <u>Strickland</u>.  <u>Miller v. Keeney</u>, 882 F.2d 1428,

25   1433 (9th Cir. 1989).  A defendant therefore must show that counsel's advice fell

26   below an objective standard of reasonableness and that there is a reasonable

27

28                                        14

probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 1434 & n.9.

Petitioner's claim that trial counsel was ineffective for failing to object to the prosecutor's use of peremptory challenges to exclude all African Americans from the jury fails because petitioner has not "affirmatively prove[n] prejudice." Strickland, 466 U.S. at 693. Petitioner has not shown that (1) had his counsel objected, it is reasonable that the trial court would have sustained the objection as meritorious; and (2) had the objection been sustained, it is reasonable that there would have been an outcome more favorable to him. Wilson v. Henry, 185 F.3d 986, 990 (9th Cir. 1999). As noted earlier, petitioner has set forth no evidence whatsoever in support of the purposeful discrimination necessary to sustain a Batson challenge. See supra at 14. Nor has he show, in view of the overwhelming evidence of guilt, that there is a reasonable probability that a different jury would have decided the case different. See Young v. Bowersox, 161 F.3d 1159, 1160 (8th Cir. 1998).

Petitioner's claim that appellate counsel was ineffective for failing to argue on appeal that petitioner was improperly convicted of five offenses for one course of conduct also fails for failure to "affirmatively prove prejudice." Strickland, 466 U.S. at 693. On appeal, counsel argued that the aggravated assault conviction should be stricken because it is necessarily included within the torture conviction. In rejecting the claim, the California Court of Appeal explained:

> In California, a single act or course of conduct by a defendant can result in multiple convictions. ([Cal. Penal Code] § 954; *People v. Pearson* (1986) 42 Cal. 3d 351, 354.) Citing the judicially created exception to this rule which prohibits multiple convictions based on necessarily included offenses (*People v. Reed* (2006) 38 Cal. 4th 1224, 1227), appellant urges that we strike his conviction for aggravated assault as necessarily included within the torture conviction. Aggravated assault is not a lesser included offense of torture and thus we will not strike the former conviction.

15

1 People v. Haney, 2006 WL 3735949, at *5.  In view of California's rule that a

2 defendant may sustain multiple convictions for a single act or course of conduct,

3 petitioner cannot show that there is a reasonable probability that, but for counsel's

4 failure to raise the issue, he would have prevailed on appeal.  See Miller, 882

5 F.2d at 1434 & n.9.

6        Petitioner is not entitled to federal habeas relief on his claims of

7 ineffective assistance of counsel.  It simply cannot be said that the state courts'

8 rejection of the claims on collateral review amounted to an objectively

9 unreasonable application of the Strickland standard.  See 28 U.S.C. § 2254(d).

10        4.     Prosecutorial misconduct/vindictive prosecution

11        Petitioner claims "prosecutorial misconduct" and/or "vindictive

12 prosecution" without any specifics.  Pet. at 6.  The claim must be rejected

13 because it is well-established that "[c]onclusory allegations which are not

14 supported by a statement of specific facts do not warrant habeas relief."  James v.

15 Borg, 24 F.3d 20, 26 (9th Cir. 1995).

16        The state courts also rejected the claim as conclusory.  See In re Haney,

17 No. 5517, slip op. at 5 (Cal. Super. Ct. Apr. 11, 2007) (Pet. Ex. A).  Their

18 rejection cannot be said to be objectively unreasonable.  See 28 U.S.C. § 2254(d).

19 /

20 /

21 /

22 /

23 /

24 /

25                 **CONCLUSION**

26        After a careful review of the record and pertinent law, the court is satisfied

27

28               16

that the petition for a writ of habeas corpus must be DENIED.

The clerk shall enter judgment in favor of respondent and close the file.

SO ORDERED.

DATED:  May 1, 2009

CHARLES R. BREYER
United States District Judge

G:\PRO-SE\CRB\HC.07\Haney, M1.merits.wpd

17